# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Charles P. Kocoras | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 6796 | **DATE** | 6/28/2001 |
| **CASE TITLE** | In Re: Allscripts, Inc. Securities Litigation | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Ruling held. **ENTER MEMORANDUM OPINION:** Defendants' motion (Doc 20-1) to dismiss is granted. We dismiss Plaintiffs' complaint in its entirety.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | **Document Number** |
| | No notices required. | | number of notices | | |
| | Notices mailed by judge's staff. | | | | |
| | Notified counsel by telephone. | | JUN 2 9 2001 | | |
| ✓ | Docketing to mail notices. | | date docketed | | |
| ✓ | Mail AO 450 form. | | | | |
| | Copy to judge/magistrate judge. | | | | |
| | | | docketing deputy initials | | |
| SCT | courtroom deputy's initials | FILED FOR DOCKETING 01 JUN 28 PM 12: 57 | date mailed notice | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN RE ALLSCRIPTS, INC.    )
SECURITIES LITIGATION    )  00 C 6796

## **MEMORANDUM OPINION**



CHARLES P. KOCORAS, District Judge:

Before the Court is the Motion to Dismiss of Defendants Allscripts Healthcare

Solutions, Inc., David B. Mullen, Glen E. Tullman, J. Peter Geerlofs, and Phillip J.

Langley. For the following reasons, we grant the Motion.

## BACKGROUND

This case arises from the sale of the common stock of Defendant Allscripts Inc.

("Allscripts" or the "Company") on the open market. Plaintiffs are a class of persons

and entities who purchased the common stock of Allscripts on the open market during

the period of March 6, 2000 through and including February 27, 2001 (the "Class

Period"). Plaintiffs named Allscripts as a Defendant as well as four individual officers

of the Company. Defendant Glen E. Tullman ("Tullman") served as Chairman of the

Board of Allscripts since May 1999 and Chief Executive Officer since August 1997.

Defendant David B. Mullen ("Mullen") was Allscripts' President and Chief Financial

Officer since August 1997. Defendant J. Peter Geerlofs ("Geerlofs") served as

Allscripts' Chief Medical Officer since April 2000. Defendant Phil Langley ("Langley") was Allscripts' Senior Vice President of Business Development/Field Services.[1]

For purposes of a motion to dismiss, we are obligated to accept as true all well-pled allegations. Founded in 1986, Allscripts was originally a drug wholesaler that provided prepackaged medicines to certain dispensing physicians. The Company later shifted its focus toward software sales and e-commerce. It developed and began marketing an "electronic prescribing solution" software package to doctors called the TouchScript ® Personal Prescriber ™ ("TouchScript"). Available on both palm-top and wall-mount computers, TouchScript used the Internet to route drug prescriptions to pharmacies and purported to provide "connectivity" to managed care and other organizations.

Defendants promoted the many purported benefits of TouchScript. For instance, TouchScript would allow physicians to save time, because typing prescriptions is faster than writing them down. Furthermore, the software could limit malpractice liability because the system was designed to avoid errors and detect harmful drug interactions.

---

[1] On occasion this Opinion refers to Defendants Tullman, Mullen, Geerlofs and Langley collectively as the "Individual Defendants."

Finally, TouchScript would enable physicians to generate greater revenues by dispensing certain medications directly from their offices.

Not surprisingly, Allscripts also emphasized to the investing public the revenues flowing from TouchScript. Physicians paid Allscripts an initial implementation fee of up to $6,000 depending on the length of the patient list in any given office. This fee covered the installation of TouchScript by an Allscripts technician. In addition, Allscripts collected a monthly subscription of $250 from each TouchScript user. Prior to and throughout the Class Period, Defendants continually highlighted these amounts. Furthermore, Defendants emphasized that physicians actually paid for TouchScript, unlike many other e-commerce products which were given away without charge.

Despite these promotions, Defendants were also realistic about the potential shortcomings of the product. In their Form 10-K disclosure for 1999,[2] filed on March 30, 2000, the Company conceded that

> Our business model depends on our ability to sell our TouchScript system
> to physicians and other healthcare providers and to generate usage by a

---

[2] The Court may take judicial notice of documents filed with the Securities and Exchange Commission without converting a motion to dismiss into a motion for summary judgment. See Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1276-81 (11th Cir. 1999). Moreover, the Complaint specifically refers to the Form 10-K filing, so we may properly refer to that document. See Wright v. Associated Ins. Cos., 29 F.3d 1244, 1248 (7th Cir. 1994) (stating that documents attached to a motion to dismiss are part of the pleadings if they are referred to in the plaintiff's complaint and are central to the claim").

> large number of physicians. We have not achieved this goal with
> previously or currently available versions of our software.

(Allscripts Form 10-K, 3/30/00, at 23.) The Company also warned potential investors

about the potential obstacle of convincing doctors to abandon traditional methods of

writing prescriptions in favor of new technological opportunities:

> We cannot assure you that physicians will integrate our products and
> services into their office work flow or that participants in the
> pharmaceutical healthcare market will accept our products and services
> as a replacement for traditional methods of conducting pharmaceutical
> healthcare transactions.

(Id.) In addition, the 10-K Form warned of the risk of errors or defects in the

technology:

> [E]arly releases of software often contain errors or defects. We cannot
> assure you that, despite our extensive testing, errors will not be found in
> our new product releases and services before or after commercial release,
> which would result in product redevelopment costs and loss of, or delay
> in, market acceptance.

(Id. at 24.) Furthermore, the 10-K Form contained a frank conclusion about the risk

of failure:

> If we fail to achieve broad acceptance of our products and services by
> physicians and other healthcare participants or to position our services as
> a preferred method for pharmaceutical healthcare delivery, our prospects
> for growth will be diminished.

(Id. at 23.) Thus, the Form 10-K disclosed that TouchScript was a new product, not

yet adopted by a large number of doctors, that could contain bugs or defects that would

preclude market acceptance. Because the Form 10-K is a public filing, these disclosures and warnings were available to all investors.

TouchScript turned out to be a hard sell. Physicians were reluctant to use, let alone pay for, new technology unless it added to their practice. However, TouchScript did not add to many practices because the system proved to be more time consuming and costly than prescribing in the traditional manner. The system frequently took as long as thirty minutes to process a single prescription and sometimes it failed to work at all. Additionally, the system required physicians to enter a patient's diagnostic code in order to call up a list of appropriate medications. Because TouchScript's list of diagnostic codes was limited, however, physicians frequently had to look up codes for similar ailments in the Physician's Desk Reference, enter them, and choose from the lists of medications that appeared, thereby consuming additional time. Moreover, the system was often busy and unable to communicate with the insurer. Thus, even those practices that could afford TouchScript ultimately lost money with the product due to fundamental flaws in the system.

Despite these problems, in late 1999 Allscripts allegedly began to reduce the implementation fee for TouchScript. In some cases, the Company eliminated the fee altogether. In addition, the Company began waiving the monthly subscription fee. In one instance, DeerPath Medical Associates did not pay installation or set-up charges

for TouchScript. In another instance, in response to Dr. Howard Baker's expression of dissatisfaction with TouchScript, the Company waived the monthy fee. Allscripts continued to represent to the public that customers paid for the product.

Realizing that TouchScript was encountering difficulty penetrating the market, Allscripts decided to purchase existing sales channels and couple TouchScript with products already being sold to doctors through those channels. Consequently, Allscripts purchased three companies with well-established sales channels in order to access physicians. Throughout this period of acquisitions, according to Plaintiffs, Allscripts was highly motivated to keep the price of its common stock high. Moreover, the Company needed to offset public shareholder concerns about dilution.

Notwithstanding these problems, Plaintiffs claim that Defendants made false and misleading statements regarding TouchScript during the Class Period. The allegedly false and misleading statements are as follows:

- March 6, 2000: Defendant Langley told <u>The Pink Sheet</u> that "one hundred percent of our clients have to pay" for TouchScript.

- March 30, 2000: In its Form 10-K for Year 1999, Allscripts made numerous representations regarding TouchScript, such as:
  - TouchScript is "easy to use, enabling a physician to complete a prescription in as little as 20 seconds";
  - TouchScript provides "valuable, objective information prior to and during the prescribing process";
  - TouchScript offers physicians a "significant financial opportunity through better management of pharmacy risk."

- July 27, 2000: Allscripts issued a press release announcing its financial results from the second quarter of fiscal year 2000. These results included revenues of $500,000 which were improperly recognized.

- August 2000: Allscripts filed Form 10Q which also reflected the improperly recognized $500,000.

- August 2000: Defendant Geerlofs comments to <u>Modern Physician</u> magazine that "[o]ther companies are trying other ways to penetrate the market, often by giving products away, and they are frequently subsidized by pharmaceutical companies. We don't need to do that."

- December 19, 2000: Defendant Mullen states to <u>Business Wire</u> that Allscripts has "multiple recurring revenue streams. Beginning with the physician, we earn revenue from the TouchScript software fees that are charged to the physician for using the product, which is typically received on a monthly subscription basis. We also earn revenue from the physician from the sale of the pre-packaged medication."

- January 2001: Defendant Mullen tells <u>Drug Topics</u> magazine that "the idea that a patient, at least for the first fill, can pick up the prescription right in the physician's office is a huge convenience. Convenience is also manifest when the physician is able to electronically send the prescription straight from his handheld computer to the pharmacy so that the medication could actually be waiting by the time the patient gets there." At another point in the interview, Mullen says that the monthly fee for TouchScript was $200.

Plaintiffs believe that these statements made during the Class Period were false and misleading. As a result of the statements, Allscripts' common stock traded at artificially inflated prices during the Class Period but ultimately plummeted.

Plaintiffs assert that Defendants were highly motivated to exaggerate sales of TouchScript because they had allocated "an extravagant amount of Allscripts' cash and resources to market the system, and it simply was not selling." An additional motivation was the three acquisitions Allscripts had made. As Plaintiffs contend, "the higher the share price, the more buying power each share had." Furthermore, Defendants were motivated to keep the stock price as high as possible to offset shareholder concerns about dilution. Last, the individual Defendants had motive to exaggerate Allscripts' performance because their annual bonuses and incentives depended on it.

On March 12, 2001, Defendants filed this two-count Complaint against Allscripts and the Individual Defendants. Count I alleges violations of section 10(b) of the Securities Exchange Act of 1934 ("the '34 Act") and Rule 10b-5 of the Securities Exchange Commission. Count II alleges control person liability pursuant to section 20(a) of the '34 Act. Defendants have moved to dismiss the Complaint in its entirety.

STANDARD OF REVIEW

Plaintiffs based this action on sections 10(b) and 20(a) of the '34 Act and Rule 10b-5. Federal Rule of Civil Procedure 12(b)(6) governs all of these claims. In addition, the claims implicate Federal Rule of Civil Procedure 9(b) and the Private

Securities Litigation Reform Act of 1995 ("PSLRA"). <u>See</u> <u>Rehm v. Eagle Fin. Corp.</u>, 954 F. Supp. 1246, 1250 (N.D. Ill. 1997).

A motion to dismiss pursuant to Rule 12(b)(6) tests whether the plaintiff has properly stated a claim for which relief may be granted. <u>See</u> <u>Pickrel v. City of Springfield, Ill.</u>, 45 F.3d 1115, 1118 (7th Cir. 1995). The court must accept as true all of the plaintiff's well-pled factual allegations as well as all reasonable inferences. <u>See</u> <u>Coates v. Illinois State Bd. of Ed.</u>, 559 F.2d 445, 447 (7th Cir. 1977). However, the court need "not strain to find inferences favorable to the plaintiffs" which are not apparent on the face of the complaint. <u>Id.</u> The court will dismiss a complaint under Rule 12(b)(6) only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." <u>Ledford v. Sullivan</u>, 105 F.3d 354, 356 (7th Cir. 1997) (quoting <u>Hishon v. King & Spalding</u>, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232 (1984)).

Rule 9(b) states that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). The rule requires plaintiffs to allege the "identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." <u>Vicom, Inc. v. Harbridge Merchant Svcs., Inc.</u>, 20 F.3d 771, 777 (7th Cir. 1994) (quoting <u>Bankers</u>

Trust Co. v. Old World Republic Ins. Co., 959 F.2d 677, 683 (7th Cir. 1992)). In other words, pleading with particularity means stating "the who, what, when, where, and how: the first paragraph of any news story." DiLeo, 901 F.2d 624, 627 (7th Cir. 1990).

Reflecting the heightened pleading requirements of Rule 9(b), the PSLRA requires complaints to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Furthermore, with respect to scienter, complaints must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The Seventh Circuit has not yet addressed the question whether the PSLRA standard displaces past case law regarding pleading standards in private securities litigation. Until the Seventh Circuit does so, we shall concur with other courts in this District who have adopted the Second Circuit's pleading standard but declined to bind courts to the Second Circuit's interpretation of that standard. See Retsky Family Ltd. P'ship v. Price Waterhouse, No. 97 C 7694, 1998 WL 774678 at *1(N.D. Ill. Oct. 21, 1998); Rehm, 954 F. Supp. at 1252; Fugman v. Aprogenex, Inc., 961 F. Supp. 1190, 1195 (N.D. Ill. 1997). That standard requires

plaintiffs to "allege facts that give rise to a strong inference of fraudulent intent." Retsky, 1998 WL 774678 at *1.

## DISCUSSION

Defendants contend that Plaintiffs have failed to state a claim under section 10(b) of the '34 Act and Rule 10b-5. In order to state a claim under these provisions, Plaintiffs must allege that Defendants made: (1) a false representation or an omission; (2) of a material fact; (3) with scienter; (4) in connection with the purchase or sale of securities; (5) upon which the claimant justifiably relied; and (6) that the false representation or omission was the proximate cause of claimant's damages. See In re Healthcare Compare Corp. Sec. Litig., 75 F.3d 276, 280 (7th Cir. 1996). Defendants argue that Plaintiffs cannot establish the requisite elements of a false representation or omission and scienter.

I. Count One: Securities Fraud

A. Alleged Omissions and False Representations

Plaintiffs identify a handful of statements they believe are false and misleading and endeavor to explain the grounds for these allegations. We find none of the allegations supportable, especially in light of the numerous frank disclosures that appear in Defendants' SEC filings. These filings announce the risks of this e-commercial venture that any reasonable investor would have spotted on his or her own.

Significantly, Plaintiffs have not challenged the veracity and forthrightness of those SEC filings. The primary purpose of these filings is, after all, to guide the decisions of the investing public. See, e.g., United States v. Arthur Young & Co., 465 U.S. 805, 810 (1984).

Instead, Plaintiffs contend that the Individual Defendants behaved fraudulently because they told falsehoods and made omissions about the products to newspapers and other media. The statements upon which they rely, however, cannot support such a conclusion. As we shall explain in greater detail, many of the statements rely on subjective determinations not susceptible to an assessment of truth or falsity. Rather, the statements amount to the kind of touting that shareholders would expect of, indeed demand of, senior officers. In the words of the Seventh Circuit, the comments are mere "puffery" lacking the "requisite specificity to be considered anything but optimistic rhetoric." Searls v. Glasser, 64 F.3d 1061, 1066 (7th Cir. 1995). The statements do not convey any "useful information upon which a reasonable investor would base a decision to invest," id., particularly when they appear in a venue directed toward potential customers, rather than shareholders.

In addition, Plaintiffs appear to argue that Defendants failed to divulge problems with TouchScript's technology and declines in customer satisfaction. However, Plaintiffs have failed to allege the existence of a duty to make such disclosures, and we

find none in the case law. Such a duty would not comport with the way the business world works. Markets are wont to ebb and flow. The securities laws do not require management to apprise the public of each and every move the market may make. Nor should management "bury the shareholders in an avalanche of trivial information – a result that is hardly conducive to informed decisionmaking." TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 448-49 (1976). As a practical matter, such a scheme would saturate the business wires and confuse investors.

Having summarized why the case at bar cannot pass muster, we now turn to a careful analysis of each of the alleged misstatements before us.

### 1. Statements Regarding TouchScript and Its Customers

On March 6, 2000, The Pink Sheet published Defendant Langley's statement that "one hundred percent of our clients have to pay" for TouchScript. Later that month, on March 30, Allscripts submitted its Form 10-K for Year 1999. In the Form 10-K, Allscript represented that TouchScript is "easy to use, enabling a physician to complete a prescription in as little as 20 seconds," and that it provides "valuable, objective information prior to and during the prescribing process." Furthermore, the Form states that TouchScript offers physicians a "significant financial opportunity through better management of pharmacy risk."

Later, in August 2000, Defendant Geerlofs commented to <u>Modern Physician</u> magazine that "[o]ther companies are trying other ways to penetrate the market, often by giving products away, and they are frequently subsidized by pharmaceutical companies. We don't need to do that." Then on December 19, 2000, an interview with Defendant David Mullen appeared in <u>Business Wire</u>. In the interview, Mullen stated that Allscripts has "multiple recurring revenue streams. Beginning with the physician, we earn revenue from the TouchScript software fees that are charged to the physician for using the product, which is typically received on a monthly subscription basis. We also earn revenue from the physician from the sale of the pre-packaged medication." Then in an interview in January 2001 in <u>Drug Topics,</u> Mullen stated that "the idea that a patient, at least for the first fill, can pick up the prescription right in the physician's office is a huge convenience. Convenience is also manifest when the physician is able to electronically send the prescription straight from his handheld computer to the pharmacy so that the medication could actually be waiting by the time the patient gets there." At another point in the interview, Mullen said that the monthly fee for TouchScript was $200.

Plaintiffs offer several explanations for why these statements were false and misleading. First, Allscripts waived and/or reduced fees for two resisting physicians. Specifically, DeerPath Medical Associates did not pay installation or set-up charges in

late 1999. Then in September 2000, Allscripts' sales representatives offered to waive the monthly fee for Dr. Howard Baker to induce him not to cancel the service. Second, Allscripts failed to disclose that TouchScript was not credentialed with many insurance companies, meaning that patients could not be reimbursed for obtaining their prescriptions through the physician. Third, pharmacies had difficulties in deciphering prescriptions. Fourth, TouchScript had a limited list of diagnostic codes. Last, according to Plaintiffs, Allscripts experienced an average return rate of 50%.

We find these reasons unavailing. That the Company waived the installation charge in one instance and the monthly fee in another does not amount to "giving away TouchScript" as Plaintiffs assert. Plaintiffs have not alleged that DeerPath Medical Association paid no money for TouchScript; instead, the allegation is limited to nonpayment of the installation fee but is notably silent as to the monthly subscription fee. The same is true of the allegation regarding Dr. Baker, which speaks to waiver of the monthly fee but is silent to the installation fee. Neither allegation suggests that the Company gave away TouchScript without receiving any payment. Thus, these allegations do not render false or misleading the statement that one hundred percent of customers pay for TouchScript.

Nor do we accept Plaintiffs' assertion that Allscripts failed to disclose that TouchScript was not credentialed with many insurance companies. As an initial

matter, Plaintiffs have failed to plead this allegation with the requisite particularity. Under the PSLRA, complaints must "specify the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). At the pleading stage, a plaintiff may satisfy this requirement by referring to internal memoranda or other documents, press releases, news articles and government-mandated filings. See In re Theragenics Corp. Sec. Litig., 137 F. Supp. 2d 1339, 1345 (N.D. Ga. 2001) (relying on Novak v. Kasaks, 216 F.3d 300 (2d Cir. 2000)). Because the instant allegation identifies no source for the information, it cannot meet this threshold requirement.

Furthermore, even if properly pled, the Form 10-K disclosures belie this allegation. In the section outlining risks related to the Company, the Form 10-K states that "[a]chieving market acceptance for our products and services will require substantial marketing efforts. . . .  If we fail to achieve broad acceptance of our products and services by physicians and other healthcare participants . . . our prospects for growth will be diminished." (Form 10-K at 23; emphasis added.)  Insurance companies are precisely those "other healthcare participants" on whose participation the success of TouchScript turned.  Their participation comprised a risk which the Form 10-K clearly spelled out.  Thus, even if many insurance companies balked at the

idea of participating in TouchScript, Allscripts adequately disclosed this possibility. That this possibility actually arose did not trigger a duty to disclose on the part of Defendants. See <u>Wielgos v. Commonwealth Edison Co.</u>, 892 F.2d 509, 515 (7th Cir. 1989) (stating that "[J]ust as a firm needn't disclose that 50% of all new products vanish from the market within a short time, so Commonwealth Edison needn't disclose the hazards of its business, hazards apparent to all serious observers and most casual ones").

Plaintiffs next contend that pharmacies "had great difficulties in deciphering prescriptions sent by TouchScript." We presume that Plaintiffs are alleging that Defendants failed to disclose these problems. This allegation, like the prior one, fails to meet the PSLRA's pleading requirements because of the dearth of information as to its source. Moreover, even if the allegation were properly pled, the Form 10-K disclosures again betray this supposition. If the alleged problems were attributable to technological glitches, the disclosures addressed such risks. If the problems stemmed from the reluctance of pharmacists to learn how to use TouchScript, this possibility too was addressed by the disclosures. That the possibility of problems later materialized does not make a claim of omission actionable. Furthermore, it does not render false some of the Individual Defendants' statements as to the quality of the TouchScript. Such statements are nothing more than the "'[s]oft, puffing' statements" that

representatives make to sell their products but upon which reasonable investors know not to rely. <u>Raab v. General Physics Corp.</u>, 4 F.3d 286, 289-90 (4th Cir. 1993); <u>Shaw v. Digital Equip. Corp.</u>, 82 F.3d 1194, 1217 (1st Cir. 1996) (stating that "courts have demonstrated a willingness to find immaterial as a matter of law a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace – loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available") (superseded by statute on other grounds); <u>Eisenstadt v. Centel Corp.</u>, 113 F.3d 738, 744 (7th Cir. 1997) (noting that general statements of customer satisfaction should not make the "heart of a reasonable investor . . . begin to flutter" because "[e]veryone knows that someone trying to sell something is going to look . . . on the bright side"). This point is especially worthy given that many of the alleged statements were made to magazines and trade publications directed at TouchScript customers, rather than investors or stockholders.

Plaintiffs' fourth ground goes to the quality of the design of TouchScript. When a physician prescribed medication using TouchScript, (s)he had to enter the diagnostic code for the particular ailment. Because TouchScript had a limited list of diagnostic codes, however, physicians were often unable to find applicable code in the software.

Instead, they resorted to looking up codes for similar ailments in the Physician's Desk Reference, then finding a code that TouchScript recognized to produce a list containing the desired medication. According to Plaintiffs, this time-consuming process deterred physicians from using TouchScript. Even if this were the case, however, it does not mean that Defendants omitted any material information about TouchScript. Defendants disclosed in the Form 10-K that early versions of TouchScript were susceptible to technological errors. If this later proved to be the case, Plaintiffs had already been put on notice as to the potential for errors and cannot recover against Defendants for alleged omissions or affirmative misrepresentations. See Gart v. Electroscope, Inc., 24 F. Supp. 2d 969, 975 (D. Minn. 1998) (stating that in a fledgling enterprise, "it is obvious to any reasonable investor that [the defendant] anticipated the continuing evolution of its products, and that any particular enhancement or new product carried with it certain risks").

Finally, Plaintiffs allege that Allscripts experienced an average return rate of 50% for TouchScript due to numerous technical problems. This allegation, too, is pled in a conclusory fashion that is ill suited to securities fraud pleadings. Plaintiffs have furnished no particularized statements of fact to support the allegation. Even assuming it were properly pled, the allegation does not present an actionable claim because Plaintiffs have not directed us to any cases establishing that Defendants had a duty to

disclose the average return rate of the product. Corporate executives have no general duty to disclose every problem that arises in selling a Company's products. Indeed, if they did, the daily business news would be saturated with reports of rises and falls in corporate revenues. What matters is that investors were made aware of the potential for such technical problems. As we have stated, a reasonable investor would have recognized immediately the risks of e-commerce. In light of these considerations, Defendants had no additional duty to disclose the peaks and valleys of TouchScript's sales pattern.

In sum, we do not find any of the aforementioned conduct to be actionable as omissions or false statements. Where a company is candid about the risks it faces in selling its product, it has no companion duty to report every glitch that arises. This is especially true in a high-risk industry such as e-commerce, where even the most casual investor could recognize the risks without significant investigation. Allscripts confronted squarely in its Form 10-K the risks of its endeavor. These statements, as well as common sense, should have put Plaintiffs on notice as to the risks involved in this e-commercial endeavor. That some of the Individual Defendants made statements to magazines and trade publications painting the product in a positive light does not rise to the level of misstatements. In short, none of the aforementioned statements forms an actionable basis for a claim of securities fraud.

## 2. Statements Regarding Recognition of $500,000

On October 26, 2000, Allscripts issued a press release announcing its financial results for the third quarter ending September 30, 2000. The press release revealed that during the quarter ending June 30, 2000 (the second quarter), Allscripts improperly recognized $500,000 in revenue flowing from an agreement with IMS Health Incorporated ("IMS"). The revision adjusted previously reported revenues for the second quarter from $12.6 million to $12.1 million, and adjusted previously reported revenues for the first six months of the year from $22.2 million to $21.7 million. The revisions increased Allscripts' net loss for the second quarter of 2000 from $24.3 million to $24.8 million and net loss for the first six months of 2000 from $26.3 million to $26.8 million.

Plaintiffs believe these statements were false and misleading. Even if this were true, however, the alleged misstatement of earnings are immaterial in light of the total amount of Allscripts' earnings and losses. The allegedly improperly recognized sum reflects a mere 4% of the Company's revenues for that quarter and just over 2% of the Company's six-month revenues. It adjusted the Company's quarterly losses by a mere 2%. Given these modest numbers, the alleged improperly recognized sum cannot as a matter of law be material. See Glassman v. Computervision Corp., 90 F.3d 617, 633 (1st Cir. 1996) (affirming conclusion that a minor drop of a few percentage points is

inadequate to support a claim of material difference for purposes of Rule 10b-5); In re First Union Corp. Sec. Litig., 128 F. Supp. 2d 871, 895 (D.N.C. 2001) (dismissing as immaterial an alleged misstatement of earnings of $79 million which amounted to a mere 2.1% of operating earnings and 2.8% of earnings); In re Newell Rubbermaid Inc. Sec. Litig., 2000 WL 1705279, at *8 (N.D. Ill. Nov. 14, 2000) (deeming immaterial allegedly undisclosed expenses that amounted to 1% of the overall expense budget as "nothing more than pocket change"). Because the alleged misstatement in the case at bar cannot satisfy the materiality element, Plaintiffs' claim under section 10(b) and Rule 10b-5 cannot survive.

> B. Scienter

Plaintiffs' failure adequately to allege scienter provides an entirely independent basis to dismiss the Complaint. The PSLRA requires Plaintiffs to plead facts giving rise to a "strong inference" that a particular defendant made a specific statement with knowledge of its falsity. 15 U.S.C. § 78u-4(b)(2). The Seventh Circuit has not yet ruled on the question of the what constitutes a "strong inference" of such knowledge. In some circuits, the plaintiff must allege specific, detailed facts demonstrating the defendant's contemporaneous knowledge of falsity. See Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1286-87 (11th Cir. 1999); In re Silicon Graphics, Inc. Sec. Litig., 183 F.3d 970, 979 (9th Cir. 1999). In other circuits, allegations of "motive and opportunity"

to commit fraud will give rise to a "strong inference" of scienter.  See In re Advanta Corp. Sec. Litig., 180 F.3d 525, 534-35 (3d Cir. 1999); Novak v. Kasaks, 216 F.3d 300, 310-11 (2d Cir. 2000).  Under either pleading standard, Plaintiffs cannot proceed.

As we have already discussed, Defendants' Form 10-K disclosures were issued toward the beginning of the Class Period on March 30, 2000.  These disclosures highlighted the risks surrounding TouchScript, particularly with respect to acceptance in the medical community and problems with the technology.  Significantly, Plaintiffs have not alleged that Defendants ever furnished inaccurate numbers as to the Company's sales, margins and customers.  Rather, Plaintiffs offer broad, unspecified allegations insinuating Defendants had "access to adverse, non-public information" about the Company, had "conducted extensive market research" on TouchScript, "received constant feedback" from salespeople and "paid close attention to sales trends" for the product.  These allegations paint with too broad a brush and cannot satisfy the PSLRA's pleading standards.  Without a clearer idea as to what the allegedly adverse, nonpublic information was, it is impossible for us to determine whether the allegedly undisclosed information could have rendered Defendants' subsequent statements untrue.  So too are we unable to measure the timing of the allegedly adverse information against the public representations made by Defendants.

It is axiomatic that Defendants could not intentionally have made false statements without previous access to accurate information.

Plaintiffs did plead with specificity regarding the two medical practices that allegedly received rebates for using TouchScript. However, these allegations cannot carry the day for Plaintiffs. In the first place, many of the allegedly false statements occurred <u>before</u> the two medical practices received the alleged rebates. Second, Plaintiffs have pointed merely to two instances among at least several hundred customers. We cannot reasonably infer from two instances the existence of "widespread problems."

Last, with respect to the improperly recognized revenue, we have already noted that the amount of the revenue is modest in comparison to the Company's total revenue. Even assuming that this accounting decision violated GAAP, merely establishing GAAP violations is not tantamount to scienter. <u>See Chu v. Sabratek Corp.</u>, 100 F. Supp. 2d 815, 823-24 (N.D. Ill. 2000). In fact, it is difficult to build inferences of scienter upon accounting errors because such errors often involve complex calculations about which reasonable people can differ in opinion. The small magnitude of the error, the Company's prompt acknowledgement of the error, and the fact that the revenue was ultimately realized all militate against an inference of scienter in this case.

Plaintiffs also appear to raise allegations going to Defendants' "general motive" to commit fraud. Plaintiffs suggest that the Individual Defendants had motive to commit fraud because they stood to benefit through their salaries and benefits. Moreover, Plaintiffs claim that the Company's recent acquisitions supplied Defendants with a motive to inflate the price of the Company's stock. These unsupported, generalized allegations of motive are insufficient as a matter of law. With respect to the Individual Defendants' salary and benefit incentives, that allegation is too general to satisfy the scienter requirement. Under Plaintiffs' argument, virtually any corporate executive would have the requisite intent to defraud, since most salaries and benefit packages have some incentive-based dimension. Moreover, with respect to the motive to inflate stock price, that too is vague. See, e.g., Coates v. Heartland Wireless Comm., Inc., 26 F. Supp. 2d 910, 918 (N.D. Tex. 1998) (dismissing allegation of motive to conceal overstatements during public offering); Novak v. Kasaks, 997 F. Supp. 425, 430 n.5 (S.D.N.Y. 1998) (concluding that allegations of motive to "raise capital" were insufficient as a matter of law to allege scienter); Glickman v. Alexander & Alexander Servs., Inc., 1996 WL 88570, at *5 (S.D.N.Y. Feb. 29, 1996) (holding that vague allegations of motive, like "desire to raise much needed capital," are too general to satisfy scienter reqirement). Without more particularized allegations, Plaintiffs cannot satisfy the scienter requirement by alleging motive.

## II. Count Two: Control Group Liability

Plaintiffs have also raised a claim pursuant to section 20(a) of the '34 Act. Section 20(a) imposes civil liability upon persons who control others who are directly liable under the Act. 15 U.S.C. § 78t. If a Complaint does not adequately allege an underlying violation of the securities laws, however, the district court must dismiss the section 20(a) claim. See Greebel v. FTP Software, Inc., 194 F.3d 185, 207 (1st Cir. 1999). Because Plaintiffs have failed to state a claim under section 10(b) of the '34 Act, they cannot assert the underlying claim required by section 20(a). Thus, their section 20(a) claim must fail.

## CONCLUSION

For the foregoing reasons, we dismiss Plaintiffs' complaint in its entirety.

Charles P. Kocoras
United States District Judge

Dated: ____June 28, 2001____

- 26 -